In the Supreme Court of Georgia

Decided: March 15, 2021

S20A1522. DUKE v. THE STATE.

MELTON, Chief Justice.

We granted interlocutory review in this case[1] to decide whether the trial court erred in determining that an indigent defendant in a criminal case who is represented by private, pro bono counsel has neither a statutory right under the Indigent Defense Act of 2003, OCGA § 17-12-1 et seq. ("IDA"), nor a constitutional right to state-funded experts and investigators needed to prepare a defense. Contrary to the trial court's conclusion, the IDA allows an indigent defendant to obtain such ancillary defense services through a contract between pro bono counsel and either the Georgia Public Defender Council ("GPDC") or the appropriate circuit public defender. Consequently, we reverse the judgment of the trial court

---

[1] This is the third time this Court has addressed pre-trial issues in this case. See *Duke v. State*, 306 Ga. 171 (829 SE2d 348) (2019); *WXIA-TV v. State*, 303 Ga. 428 (811 SE2d 378) (2018).

in part, vacate it in part, and remand the case with direction.

1.   *Procedural History*

An Irwin County grand jury indicted Ryan Duke in April 2017 for malice murder and related offenses in connection with the October 2005 death of Tara Faye Grinstead. For approximately 17 months, Duke was represented by a public defender from the Tifton Judicial Circuit's Public Defender's Office.  Then, in August 2018, Duke's public defender withdrew from representation and John Merchant and Ashleigh Merchant filed an entry of appearance, indicating that they were representing Duke pro bono.[2]

In November 2018, defense counsel filed motions seeking funds from Irwin County to hire an expert in false confessions and an investigator.  The trial court denied the motions on December 7, 2018, ruling that the IDA no longer required local governments to provide funding for such requests.  A week later, defense counsel re-filed the motions for funds, this time requesting that the trial court

---

[2] John Gibbs from the law firm Troutman Pepper (formerly Troutman Sanders) later filed an entry of appearance in February 2019, joining the defense team as pro bono counsel.

2

order the GPDC and the State of Georgia to pay for the defense team's investigator and expert, instead of Irwin County. The trial court subsequently denied these motions.

Then, in February 2019, defense counsel sent a letter to the GPDC directly, requesting it provide funding for the defense team to hire a DNA True Allele expert, a forensic psychologist, an expert in false confessions, and an investigator, arguing that Duke was entitled to such funding under the IDA by virtue of his indigency. The director of the GPDC formally denied the request in a detailed letter, explaining that, because Duke was represented by private counsel, Duke did not qualify for financial assistance, even though defense counsel were representing him pro bono.

Around this same time, defense counsel filed a consolidated motion in the trial court requesting funds to hire the same DNA True Allele expert, forensic psychologist, false confessions expert, and investigator. The trial court held an ex parte hearing on the motion on February 28, 2019. At the hearing, defense counsel presented testimony from John Mobley, the Circuit Public Defender

3

for the Tifton Judicial Circuit, and Brandon Bullard, who was then the Chief Legal Officer of the GPDC, concerning their interpretation and application of the IDA as it related to Duke's request for public funds. While Mobley and Bullard agreed that the IDA allowed the GPDC and circuit public defenders to contract with consultants and lawyers not otherwise employed by the public defender system, Bullard testified that there was no mechanism within the IDA that would allow private, pro bono counsel to contract with the GPDC in order to access state funding for experts and investigators. Further, Mobley testified that his office determines whether a defendant qualifies for public defender services based upon whether that person meets the IDA's definition of "indigent." See OCGA § 17-12-2 (6) (C). Mobley testified that, because Duke had retained private counsel, he no longer met that definition. Mobley also noted that the director of the GPDC had recently sent Duke a letter explaining why he no longer met the IDA's definition of indigence, and Mobley "defer[red] to her answer" on the question of indigence.

After the hearing, but before issuing a written order, the trial

court wrote to defense counsel stating that, though it would likely deny the consolidated motion,

> it is the opinion of the Court that the [GPDC] cannot decline to provide counsel to Mr. Duke because he has pro bono counsel or [counsel] that is paid by a third party. So, if Mr. Duke reapplies to Mr. Mobley's office for services, declining such an application [on] that ground would violate Mr. Duke's right under the Georgia Constitution.

However, on March 14, 2019, the trial court entered a written order denying defense counsel's consolidated motion. Though the trial court found Duke to be indigent and noted that "[t]he record developed as to [Duke's] need for the experts he requests is compelling," the court concluded "that while [Duke] has a constitutional right to be represented by private, pro bono counsel if he so chooses, he is not simultaneously constitutionally entitled to experts and investigators funded by the State." In the meantime, Duke, through his pro bono counsel, re-applied to the Tifton Circuit Public Defender for representation. The Circuit Public Defender responded, in pertinent part, that the office "is legally and ethically obligated to represent only those clients who are qualified for public defender services. As [Duke] is currently represented by counsel,

the application . . . is, unfortunately, denied."

Thereafter, Duke sought certification to appeal the trial court's March 14 order. When the trial court refused to certify its order for immediate review, Duke filed, in this Court, an Emergency Application for Leave to Appeal Interlocutory Order pursuant to *Waldrip v. Head,* 272 Ga. 572 (532 SE2d 380) (2000), along with an Emergency Motion for Supersedeas. This Court issued an order staying the case, but later dismissed Duke's application for lack of jurisdiction, overruling *Waldrip*. See generally *Duke v. State*, 306 Ga. 171 (829 SE2d 348) (2019).

On remand, Duke renewed his motion for funds for experts and an investigator. In his motion, Duke requested that the trial court find him indigent again. He also requested that the trial court grant state funding for his experts and an investigator, or declare the IDA unconstitutional. After a hearing, at which the prosecutors were present along with Duke and his defense team,[3] the trial court

---

[3] All prior motions, hearings, and orders concerning funding were handled ex parte. This was the first hearing at which the prosecutors were present.

6

denied Duke's renewed motion in a lengthy order on January 3, 2020. As to whether Duke qualified as indigent under the IDA, the trial court concluded that

> [w]hether or not [Duke's three] pro bono attorneys evinces the existence of [his] "other resources" enabling him to have counsel without undue hardship is debatable. The Tifton Circuit Public Defender obviously believes it does. And while his determination in this regard is certainly reviewable by the judiciary, in deference to the statutory scheme established by the Georgia legislature entrusting this determination to the executive branch, the various circuit public defenders' determinations should not be disturbed by the judiciary absent such conduct arising to a clear and intolerable violation of constitutionally guaranteed right(s).

Concerning Duke's request for funds, the trial court first looked to the IDA and concluded that

> state-funded ancillary services are authorized solely through the circuit public defender and are not severable from representation by the GPDC. The [IDA] explicitly contemplate[s] state-funded investigators and other personnel for the assistance of the circuit public defenders. The IDA does not authorize state funds for an indigent defendant's necessary, ancillary services of his choice. *The IDA does not contemplate a method whereby an indigent criminal defendant represented by private or pro bono counsel could obtain state funds for ancillary defense services.* Thus, an indigent defendant is entitled to state-funded ancillary services only if represented by a public defender.

7

(Emphasis supplied.)  Having determined that the IDA did not

provide a mechanism through which an indigent defendant with pro

bono counsel could obtain state-funded ancillary services, the trial

court turned to the constitutional questions presented by this case

and concluded that the IDA did not violate Duke's Sixth Amendment

right to counsel or his Fourteenth Amendment right to due process

under the United States Constitution.  At the request of Duke's

defense counsel, the trial court timely certified its order for

immediate review.

This Court granted Duke's application for interlocutory appeal

and subsequently posed three questions to the parties.[4]  However,

---

[4] Initially, upon granting the application, this Court asked the parties:

> Did the trial court err in holding that an indigent defendant in a criminal case who is represented by private, pro bono counsel does not have a constitutional right or a statutory right under the Indigent Defense Act, OCGA § 17-12-1 et seq., to state-funded experts and investigators?

After receiving the parties' briefs, as well as briefs from amici curiae, we requested oral argument and posed two additional questions:

> Does an indigent defendant have a due process right to publicly funded experts if he chooses to be represented by private, pro bono counsel?

based upon the current record in this case, we need not answer those questions for two reasons: (1) because the trial court erred by adopting the GPDC's and circuit public defender's legal interpretation that, under the IDA, simply because Duke is represented by pro bono counsel, he is not indigent; and (2) because the trial court erred by concluding that the IDA provides no mechanism for an indigent defendant represented by pro bono counsel to obtain state funds for ancillary defense services from the GPDC or the circuit public defender. Accordingly, we reverse those parts of the trial court order, vacate the trial court's constitutional rulings because those issues did not need to be decided at this time, and remand the case for further proceedings consistent with this opinion.

2.   *Analysis*

Duke argues that he is indigent, that his indigent status

---

If so, then what government entity is responsible for providing the funding for such experts and investigators in this case?

entitles him to state-funded ancillary services – here, experts and an investigator – under the IDA, and that the trial court's conclusions that he is not indigent and that he is not entitled to state-funded ancillary services were erroneous. He further argues that his decision to exercise his constitutional right to counsel of his choice cannot impede his constitutional right to due process and a fair trial by denying him, as an indigent defendant, access to state-funded ancillary services. In response, the State argues that the trial court properly ruled that Duke no longer met the definition of "indigent" under the IDA because he had retained "high profile" pro bono counsel, that the IDA does not provide a mechanism for the GPDC to pay for Duke's ancillary services, and that Duke waived his constitutional right to state-funded ancillary services when he chose to forgo representation by state-funded counsel.

a. *Indigency under the IDA*

First, we review the trial court's ruling on Duke's indigent status. The IDA establishes the GPDC as "an independent agency within the executive branch of state government," OCGA § 17-12-1

(b), that is "responsible for assuring that adequate and effective legal representation is provided . . . to *indigent persons* who are entitled to representation *under this chapter*," OCGA § 17-12-1 (c). (Emphasis supplied.) OCGA § 17-12-2 (6) (C) defines an "indigent defendant" for purposes of the IDA as

> [a] person charged with a felony who earns or, in the case of a juvenile, whose parents earn, less than 150 percent of the federal poverty guidelines *unless there is evidence that the person has other resources that might reasonably be used to employ a lawyer without undue hardship* on the person, his or her dependents, or, in the case of a juvenile, his or her parents or the parent's dependents.

(Emphasis supplied.). The parties agree that the IDA applies only to indigent defendants as so defined, and it is undisputed that Duke is charged with a felony and earns less than 150% of the federal poverty guidelines. The parties disagree, however, as to whether pro bono counsel qualifies as "other resources that might reasonably be used to employ a lawyer," therefore removing Duke from the statutory definition of indigency. We agree with Duke that the trial court erred in adopting the GPDC and circuit public defender's interpretation of OCGA § 17-12-2 (6) (C) that pro bono counsel

11

qualifies as "other resources" under the IDA's definition of indigency.

It is well settled that "[a] statute draws its meaning . . . from its text." (Citation omitted.) *Chan v. Ellis*, 296 Ga. 838, 839 (1) (770 SE2d 851) (2015). When interpreting a statute, we must give the text its plain and ordinary meaning, view it in the context in which it appears, and read it in its most natural and reasonable way, see *Deal v. Coleman*, 294 Ga. 170, 172-173 (1) (751 SE2d 337) (2013) while also giving meaning to all words in the statute, see *Arby's Rest. Grp., Inc. v. McRae*, 292 Ga. 243, 245 (734 SE2d 55) (2012). When we construe a statute on appeal, our review is de novo. See *Hankla v. Postell*, 293 Ga. 692, 693 (749 SE2d 726) (2013).

OCGA § 17-12-2 (6) (C) contemplates that a criminal defendant with earnings below certain poverty guidelines is indigent *unless* he has "*other resources* that might reasonably be used to *employ a lawyer*." (Emphasis supplied.). While the parties focus their arguments on the phrase "other resources," we must consider the meaning of this phrase in conjunction with the rest of the sentence,

and, in doing so, we must determine what it means to "employ" a lawyer. The term "resources" is broadly defined to mean "a source of supply or support; an available means," "a natural source of wealth or revenue," and "computable wealth." Merriam Webster's Collegiate Dictionary 997 (10th ed. 1995). Meanwhile, "employ," when it is used in connection with personal services, is defined as hiring a person *for pay*. See, e.g., Webster's New World College Dictionary 446 (4th ed. 2007) (defining "employ" in this context as "to provide work and pay for, to engage the services or labor for pay" and "the state of being employed, esp. for pay; paid service"); Merriam Webster's Collegiate Dictionary 379 (10th ed. 1995) (defining "employ" in this context as "to provide with a job that pays wages or a salary"); The New Shorter Oxford English Dictionary, Volume 1, 810 (1993) (defining "employ" in this context as to "use or retain the services of (a person), esp. in return for payments; pay (a person) to work for oneself or one's organization"). Giving the pertinent text of the statute its plain and ordinary meaning in the context in which it appears, the "other resources" – i.e., resources

other than "earnings" – must be usable to "employ" – i.e., provide work *and pay for* – a lawyer. But the very definition of pro bono counsel is lawyers who represent clients *without pay*. See Black's Law Dictionary (11th ed. 2019) (defining "pro bono" as "[u]ncompensated, esp. regarding free legal services performed for the indigent or for a public cause").

Simply put, when a defendant is represented by pro bono counsel, that lawyer is not an "other resource" available to "employ a lawyer." Further, the fact that a defendant has pro bono counsel is not evidence that he has "other resources that might reasonably be used to employ a lawyer" for the purpose of determining indigence under OCGA § 17-12-2 (6) (C). The trial court's adoption of an interpretation to the contrary was error.[5]

b. *Pro bono counsel's potential access to state funds under the IDA*

Next, we turn to the question of whether the IDA includes a

_____

[5] The record does not indicate that Duke has any "other resources that might reasonably be used to employ a lawyer," although, we recognize that a finding of indigency or non-indigency can always be reconsidered if circumstances change.

14

mechanism for pro bono counsel to access state funding for ancillary defense services. Reading the statute as a whole, we conclude that the trial court's ruling (in accord with the GPDC's assertion) that pro bono counsel have no means by which to access state-funded ancillary services under the IDA is erroneous.

The IDA provides state-funded legal defense services for indigent defendants, which includes attorneys and investigators. See OCGA §§ 17-12-23 (discussing representation of indigent defendants by circuit public defenders); 17-12-28 (authorizing employment of investigators by circuit public defenders); 17-12-29 (authorizing employment of administrative, clerical, and paraprofessional personnel by circuit public defenders). The IDA further requires the director of the GPDC to

> work with and provide support services and programs for circuit public defender offices *and other attorneys representing indigent persons* in criminal or juvenile cases in order to improve the quality and effectiveness of legal representation of such persons and otherwise fulfill the purposes of this chapter. Such services and programs shall include, but shall not be limited to, technical, research, and administrative assistance; educational and training programs for attorneys, investigators, and other staff; assistance with the representation of indigent

defendants with mental disabilities; assistance with the representation of juveniles; assistance with death penalty cases; and assistance with appellate advocacy.

(Emphasis supplied.) OCGA § 17-12-5 (b) (1). See also OCGA § 17-12-5 (b) (3) ("The director may . . . contract with outside consultants on behalf of the office as may be necessary to provide the services contemplated by this chapter.").[6] The text and structure of the IDA therefore indicate that the GPDC and its director will support attorneys who represent indigent defendants but are not in a circuit public defender office.

The IDA also allows the GPDC and circuit public defenders to contract with outside counsel and then provide ancillary service funding to indigent defendants represented by such attorneys. The IDA expressly requires the GPDC to contract with conflict attorneys in death penalty cases. See OCGA § 17-12-12.1. The statute also allows circuit public defenders to employ, in addition to assistant and deputy public defenders, "other attorneys" where authorized by

---

[6] The General Assembly also granted the GPDC the general authority to contract. See OCGA § 17-12-4 (a) (3) ("The council . . . [m]ay contract.").

local law and funding. See OCGA § 17-12-31 (a).

It is clear that "other attorneys" refers to attorneys who do not work in circuit public defender offices. See OCGA §§ 17-12-5 (b) (1) ("The director shall work with and provide support services and programs for circuit public defender offices *and other attorneys* representing indigent persons in criminal or juvenile cases . . .") (emphasis supplied); 17-12-31 (a) ("The circuit public defender in each judicial circuit may employ additional assistant circuit public defenders, deputy circuit public defenders, *or other attorneys* . . . .") (emphasis supplied). But, the State argues that "other attorneys" refers only to the non-public defenders specifically mentioned within the IDA, namely conflict counsel and capital defenders. Duke argues that "other attorneys" need not be read so restrictively, and that doing so would violate his Sixth Amendment right to counsel of his choice and his Fourteenth Amendment right to due process and a fair trial. Instead, Duke argues that the legislature intended "other attorneys" to extend generally to counsel outside the public defender system who represent criminal defendants who qualify as

17

indigent under the IDA.  As a textual matter, we agree with Duke that "other attorneys" is best read broadly.

"Other," an expansive term, is defined as "the remaining one or ones of two or more; different or distinct from that or those referred to or implied; different in nature or kind; further or additional; former." Webster's New World College Dictionary 1021 (4th ed. 2007).  See also Merriam Webster's Collegiate Dictionary 823 (10th ed. 1995) (defining "other" as "being the one (as of two or more) remaining or not included; being the one or ones distinct from that or those first mentioned or implied"); The New Shorter Oxford English Dictionary, Volume II, 2031 (1993) (defining "other" as "that remain(s) from a specified or implied group of two or (later) more" and "existing besides or distinct from that or those already specified or implied; further, additional").  And the General Assembly utilized the word "other" throughout the IDA to broadly refer to things beyond those specified in the statute.  See, e.g., with all emphases supplied, OCGA §§ 17-12-6 (a) (1) ("The [GPDC] may assist public defenders throughout the state . . . [with t]he preparation and

distribution of a basic defense manual *and other educational materials*”); 17-12-10.2 (“The members of the [GPDC] as created by this article, the members of the circuit public defender supervisory panel created by Article 2 of this chapter, *and other policy-making or administrative personnel acting in a policy-making or administrative capacity* shall not be subject to civil liability”); 17-12-32 (“The governing authority of such county or municipality shall transfer to the council such funds as may be necessary to cover the compensation, benefits, travel, *and other expenses* for such personnel”); 17-12-51 (a) – (d) (multiple provisions authorizing trial courts to order defendants represented by a public defender to pay “all or a portion of the cost for providing legal representation *and other expenses of the defense*” as a condition of probation).

Moreover, the General Assembly references attorneys representing indigent defendants in various parts of the IDA without limiting the meaning of those “attorneys” to either conflict counsel or capital defenders. See, e.g., with emphases supplied OCGA §§ 17-12-5 (b) (1); 17-12- 6 (a) (3) (explaining that the GPDC

19

may help in "[t]he promotion of and assistance in the training of *indigent defense attorneys*"); 17-12-11 (b) (providing "the circuit public defender o*r other attorney who represented the indigent person at the time of the finding of not guilty by reason of insanity*" the option to continue representation of that person); 17-12-31 (a) ("The circuit public defender in each judicial circuit may employ additional assistant circuit public defenders, deputy circuit public defenders, *or other attorneys . . . .*").  Indeed, when the General Assembly wished to limit the IDA's reach as it applies to "other attorneys," the legislature did so explicitly.  See, e.g., with all emphases supplied, OCGA §§ 17-12-24 (c) ("The circuit public defender shall keep and maintain appropriate records, which shall include the number of persons represented, including cases assigned to *other counsel based on conflict of interest*"); 17-12-33 (a) & (b) (referring to "*other attorney[s]* at law *employed full time by the circuit public defender*"); 17-12-50 (2) (defining "[p]ublic defender" as "an attorney employed by a circuit public defender office *or any other attorney who is paid from public funds* to represent an indigent person in a criminal

20

case"). If the General Assembly wanted to limit the GPDC's ability to contract with "other attorneys" exclusively to conflict counsel and capital defenders, it could have done so explicitly, instead of simply utilizing the expansive term "other." For all of these reasons, we conclude that the IDA provides pro bono counsel representing indigent defendants access to state-funded ancillary defense services by contracting with either the GPDC or the appropriate circuit public defender. The trial court's contrary conclusion was erroneous.

The State asserts that allowing pro bono counsel access to public funds for ancillary services through the IDA would drain the GPDC's resources to provide competent representation to indigent defendants represented by public defenders. We disagree. The IDA established a system, supervised by the GPDC, for funding defense counsel and ancillary services for indigent defendants to ensure that defense lawyers and ancillary service providers are competent and conflict-free, and that public funds are used in compliance with the

21

statutory scheme.[7] The GPDC exercises that oversight not just for its own employees and the circuit public defenders and their employees, but also through contracts with outside counsel and ancillary service providers. See, e.g., OCGA §§ 17-12-12.1; 17-12-28; 17-12-29; 17-12-31 (a). Indeed, the State's asserted fiscal interests are actually advanced by the ability of the GPDC and the circuit public defenders to contract with pro bono counsel representing indigent defendants. In that scenario, the GPDC retains oversight of the competence and cost of ancillary services while avoiding the expenditure of additional public funds to provide counsel because pro bono counsel need not be compensated for the work.

   3.   *Conclusion*

---

[7] See, e.g., OCGA §§ 17-12-4 (b) (requiring GPDC to establish an auditing procedure for the handling of public funds); 17-12-5 (b) (1) (requiring the director of the GPDC to work with and provide support services and programs for attorneys representing indigent defendants "in order to improve the quality and effectiveness of legal representation of such persons"); 17-12-5 (d) (detailing, among other things, the financial oversight duties of the GPDC director); 17-12-6 (b) (1) (establishing the GPDC as "the fiscal officer for the circuit public defender offices [who] shall account for all moneys received from each governing authority"); 17-12-7 (requiring the GPDC to "at all times act in the best interest of indigent defendants who are receiving legal representation" under the IDA).

Based on the foregoing, we conclude that the IDA provides a mechanism for pro bono counsel representing an indigent defendant to access public funding for ancillary defense services: by entering into a contractual relationship with either the circuit public defender or directly with the GPDC. We note that, although Duke's pro bono counsel applied for *funding* from the GPDC, the record does not indicate that his counsel has tried to *contract* for ancillary services with either the GPDC or the Tifton Judicial Circuit Public Defender, as is authorized under the IDA. But, given the GPDC's legal position, the circuit public defender's adoption of the same position, and the trial court's endorsement of that position in its January 2020 order, such a request for a contract likely would have been futile before our opinion today.

To be clear, we do not hold that an indigent defendant who has pro bono counsel is entitled to more favorable conditions in terms of ancillary services under the IDA through a contract with the GPDC or a circuit public defender than any other indigent defendant who is represented by counsel under the IDA. Instead, we merely hold

23

that there is a mechanism under state law for pro bono counsel representing an indigent defendant to access public funding for ancillary services. This also means that we need not conclusively decide at this time whether, in this case, the United States Constitution requires provision of ancillary services for indigent defendants by some other mechanism outside the IDA.

Accordingly, we reverse the parts of the trial court's order ruling that pro bono counsel qualify as "other resources that might reasonably be used to employ a lawyer" under the IDA's definition of indigency, and that the IDA does not provide a mechanism by which an indigent criminal defendant represented by pro bono counsel can obtain state funds for ancillary defense services. Because the contractual mechanism is available to Duke, there is no need at this point to address the difficult constitutional questions that would arise if Duke is unable to obtain needed ancillary services in this case.[8] Because the trial court also did not have to decide

---

[8] For example, it is not clear under the United States Constitution how an indigent defendant who exercises his *Sixth Amendment* right to *counsel of*

24

those questions, we vacate that portion of the trial court's order. And we remand the case to allow Duke to seek a contract with the GPDC or the circuit public defender that would provide him access to state-funded ancillary services.[9]

*Judgment reversed in part and vacated in part, and case remanded with direction.  All the Justices concur, except Bethel, J., who dissents.*

---

his choice, either by choosing pro bono counsel or by proceeding pro se, can obtain public funding for ancillary services to which he is entitled as a matter of *due process* under the *Fourteenth Amendment* if a state's statutory indigent defense system does not provide such funding. Indeed, as briefed by the parties and amici curiae in this case, appellate courts across the country have wrestled with this question and have reached differing conclusions.  Compare, e.g., *State v. Wool*, 648 A2d 655, 660 (Vt. 1994); *Ex Parte Sanders*, 612 S2d 1199, 1201 (Ala. 1993); *State v. Boyd*, 418 SE2d 471, 475-476 (NC 1992), with, e.g., *Crawford v. State*, 404 P3d 204, 216 (Alaska Ct. App. 2017); *Moore v. State*, 889 A2d 325, 343 (Md. 2006); *People v. Cardenas*, 62 P3d 621, 623 (Colo. 2002). The dueling analyses by the concurring and dissenting opinions further demonstrates the difficulty of deciding this question.   Moreover, a determination by this Court that a constitutional right to state-funded ancillary services exists outside the IDA would create additional issues in determining which public entity should provide such funding.

[9] We express no opinion as to whether the ancillary services that Duke has requested are needed under *Ake v. Oklahoma*, 470 U.S. 68 (105 SCt 1087, 84 LE2d 53) (1985).

S20A1522. DUKE v. THE STATE.

PETERSON, Justice, concurring.

I concur in the majority opinion. I write separately to make explicit something the majority leaves implicit: the GPDC would be most unwise to decline to contract with Duke's counsel on remand. This is because, contrary to the dissent's dismissal of Duke's constitutional arguments, Duke may very well have a constitutional right to state-funded experts. To determine whether Duke in fact does have such a right notwithstanding his representation by pro bono lawyers would require us to decide a thorny constitutional question of first impression in this jurisdiction. Happily, the majority's interpretation of the IDA renders such a difficult analysis unnecessary today.

We have often observed that the Constitution does not forbid the criminal justice system from imposing hard choices on defendants. See, e.g., *Elliott v. State*, 305 Ga. 179, 211 (IV) (B) (824 SE2d 265) (2019) ("[T]his poor option set [posed to a DUI arrestee]

26

is merely a consequence of there being probable cause to arrest a person for driving under the influence. And making a choice between two unpalatable options is still a choice."). This is so even when those hard choices involve competing constitutional rights; the criminal justice system need not invent new procedures to eliminate the natural consequences of choosing a particular path. And the United States Supreme Court has repeatedly observed that its holdings that indigent defendants are entitled to certain state-funded assistance do not dictate to the states a specific mechanism for providing that assistance. See, e.g., *Ake v. Oklahoma*, 470 U.S. 68, 83 (105 SCt 1087, 84 LE2d 53) (1985) ("Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the States the decision on how to implement this right."); *Griffin v. Illinois*, 351 U.S. 12, 20 (76 SCt 585, 100 LE2d 891) (1956) ("We do not hold, however, that Illinois must purchase a stenographer's transcript in every case where a defendant cannot buy it. The [Illinois] Supreme Court may find other means of

affording adequate and effective appellate review to indigent defendants.").

But, as discussed below, neither of those familiar principles decides this case, which involves two unrelated and not incompatible rights — the right to counsel of choice and an indigent criminal defendant's right to publicly funded ancillary defense services. Both the United States and Georgia Constitutions enshrine strong rights to counsel of choice. The United States Supreme Court has long held that the Sixth Amendment includes, within limits, a right for the defendant to choose the counsel he thinks will best serve him. See *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146-48 (126 SCt 2557, 165 LE2d 409) (2006) ("So also with the Sixth Amendment right to counsel of choice. It commands, not that a trial be fair, but that a particular guarantee of fairness be provided — to wit, that the accused be defended by the counsel he believes to be best. . . . The right to select counsel of one's choice . . . has never been derived from the Sixth Amendment's purpose of ensuring a fair trial. It has been regarded as the root meaning of the constitutional

guarantee."); *Powell v. Alabama*, 287 U.S. 45, 53 (53 SCt 55, 77 LE 158) (1932) ("It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice."). The provision now found at Article I, Section I, Paragraph XIV of the Georgia Constitution — "[e]very person charged with an offense against the laws of this state shall have the privilege and benefit of counsel" — embodies a robust right to choice of counsel as well. See *Registe v. State*, 287 Ga. 542, 544 (2) (697 SE2d 804) (2010) ("One element of the right to counsel in criminal prosecutions, as guaranteed by the Sixth Amendment . . . [and] the Georgia Constitution of 1983, is the right of a defendant who does not require appointed counsel to choose who will represent him."); *Delk v. State*, 100 Ga. 61, 61 (1) (27 SE 152) (1896) ("The provision in the 'bill of rights' declaring that 'every person charged with an offense against the laws of this State shall have the privilege and benefit of counsel' confers upon every person indicted for crime a most valuable and important constitutional right, and entitles him to be defended by counsel of his own selection whenever he is able

and willing to employ an attorney and uses reasonable diligence to obtain his services."). And pertinent to this case, the United States Supreme Court has made clear that the federal right to choice of counsel extends to pro bono counsel. See *Caplin & Drysdale v. United States*, 491 U.S. 617, 624-25 (109 SCt 2646, 105 LE2d 528) (1989) ("[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds.").

The other right at issue in this case, an indigent criminal defendant's right to publicly funded ancillary defense services, is clearly established by the United States Supreme Court. See *McWilliams v. Dunn*, __ U.S. __, __ (137 SCt 1790, 198 LE2d 341) (2017) ("*Ake* clearly established that a defendant must receive the assistance of a mental health expert who is sufficiently available to the defense and independent from the prosecution to effectively 'assist in evaluation, preparation, and presentation of the

defense.'").[10] This right is rooted in the Due Process Clause, not merely derivative of the Sixth Amendment right to appointed counsel. See *Ake,* 470 U.S. at 76-83 (Fourteenth Amendment Due Process Clause confers a right to access to a psychiatrist to assist defense where sanity at time of offense is to be a significant factor at trial). The right of expert assistance thus is distinct from the right to choice of counsel and must be safeguarded independently.

No case law supports forcing a choice between two constitutional rights that don't already have some meaningful tension between them such that they are to some extent mutually exclusive. To be sure, "[t]he criminal process, like the rest of the

---

[10] We have held that this right extends beyond psychiatric experts. See *Bright v. State*, 265 Ga. 265, 270 (2) (c) (455 SE2d 37) (1995); *Roseboro v. State*, 258 Ga. 39, 40 (3) (b) (365 SE2d 115) (1988). An indigent criminal defendant generally is entitled to state funds for an expert to examine "critical evidence, which, in light of its novelty, is likely to be the subject of varying expert opinions." *Thornton v. State*, 255 Ga. 434, 435 (2) (339 SE2d 240) (1986); see also *Finn v. State*, 274 Ga. 675, 677 (2) (558 SE2d 717) (2002).

> In order to obtain funds for an expert witness, a motion on behalf of an indigent criminal defendant "should disclose to the trial court, with a reasonable degree of precision, why certain evidence is critical, what type of scientific testimony is needed, what that expert proposes to do regarding the evidence, and the anticipated costs for services."

*Williams v. State*, 303 Ga. 474, 476 (2) (813 SE2d 384) (2018) (quoting *Roseboro*, 258 Ga. at 41 (3) (d)).

legal system, is replete with situations requiring the making of difficult judgments as to which course to follow." *McGautha v. California*, 402 U.S. 183, 213 (91 SCt 1454, 28 LE2d 711) (1971) (citation and punctuation omitted), vacated on other grounds sub. nom. *Crampton v. Ohio*, 408 U.S. 941 (92 SCt 2873, 33 LE2d 765) (1972). "Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." Id. But a defendant's constitutional rights may be violated when "compelling the election impairs to an appreciable extent any of the policies behind the rights involved." Id. Here, compelling an indigent defendant to choose between his two rights — accessing state-funded ancillary defense services and retaining his chosen pro bono counsel — potentially impairs to an appreciable extent one or both of those rights. There is no clear tension between the simultaneous exercise of those two rights that naturally leads to

compelling such a choice.[11]

Whether the State may force an indigent defendant to waive his right to counsel of choice in order to invoke his right to state-funded experts is particularly questionable given that the State has offered no good reasons for such a requirement. The State argues that requiring it to provide ancillary services to those indigent defendants who choose counsel outside the services of the GPDC "poses a significant and seemingly exponential financial burden upon the State." But budgetary concerns alone are insufficient to relieve the State of its obligations to safeguard both the right to counsel of choice and the right to ancillary defense services for

---

[11] I also note that longstanding United States Supreme Court doctrine provides that the government may not deny a person a benefit — even one that it is not obligated to provide — on a basis that infringes upon the person's constitutional rights. See *Perry v. Sindermann*, 408 U.S. 593, 597 (92 SCt 2694, 33 LE2d 570) (1972) (even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, the government may not deny a benefit to a person on a basis that infringes his constitutionally protected interests). Although this principle may not directly apply to the case at hand, it seems relevant here where the benefit — public funding for certain ancillary defense services for indigent defendants — is something that the State is in fact constitutionally obligated to provide. I question whether the State may condition access to that benefit on giving up one's choice of counsel.

indigent defendants. See *Garland v. State*, 283 Ga. 201, 205 n.5 (657 SE2d 842) (2008) ("In light of the constitutional rights involved, we find no merit in the Council's policy arguments, e.g., the need for trial lawyers to gain appellate experience, or in its budgetary concerns that it raises as warranting a different holding."). This is particularly true here, where there are other ways to ensure cost control and quality. As today's majority opinion explains in detail, the IDA provides a mechanism for pro bono counsel representing indigent defendants to contract with either the GPDC or a circuit public defender in order to access state-funded ancillary defense services, giving the State a mechanism to control the terms of the provision of such services.[12] And even in the absence of such a contract, the trial court retains the authority and responsibility to determine whether the defendant is entitled to the requested resources and approve the specific expert or other resource to be

---

[12] I agree with the majority opinion that pro bono counsel may not dictate the terms of such a contract; I don't see any constitutional reason why such contracts would have to be on any different terms than those the GPDC and the circuit public defenders already have with conflict attorneys.

34

provided. See *Brown v. State*, 260 Ga. 153, 157 (7) (391 SE2d 108) (1990) (indigent defendant's right to expert assistance is not a "right to choose a psychiatrist of his personal liking or to receive funds to hire his own"); *Thornton v. State*, 255 Ga. 434, 435 (3) (339 SE2d 240) (1986) (providing that the trial court "shall appoint an appropriate professional, whose experience, at minimum, is substantially equivalent to that of the state's expert witness, to examine the state's evidence on behalf of" the defendant and "approve the payment of reasonable compensation for such services").[13] Thus, Duke's claim is not resolved merely by applying the familiar principles that the Constitution does not forbid compelling hard choices and does not dictate the specific mechanisms for providing constitutionally required expert

---

[13] The State's claim that Duke's position would impose on it a severe financial burden is itself a bit mystifying. The State's position would seem to discourage lawyers from taking on the cases of indigent criminal defendants pro bono, shifting additional defense representation costs onto the State. See *English v. Missildine*, 311 NW2d 292, 294 (Iowa 1981) ("It would be strange if the Constitution required the government to furnish both counsel and investigative services in cases where the indigent needs and requests public payment for only investigative services. The State's theory would impose an unreasonable and unnecessary additional burden on the public treasury.").

assistance.[14]

And it is perhaps for that reason that the dissent advances a wholly different and unfamiliar principle: that the State may condition its compliance with the federal Due Process Clause's mandate to provide a fair trial upon the waiver of unrelated state and federal constitutional rights — here, the right to counsel of choice. The dissent does not cite a single case for this novel proposition.[15] Nor does the dissent explain how much further its proposition might extend. If the State may condition satisfying its constitutional obligation to provide expert assistance upon a waiver

---

[14] I agree with the dissent that even if the IDA did not permit contracting with Duke's counsel, the statute would still not be unconstitutional. But in my view, that's because even then the IDA would not *prohibit* Duke from receiving ancillary services; it simply would not be the vehicle for providing them and Duke would have to look directly to the trial court for such services. Thus, to the extent constitutional claims must satisfy a higher standard when they challenge a statute, I don't consider that higher standard applicable here.

[15] For that matter, not a single case cited in the dissent even involves the guarantee that we have found in the Georgia Constitution of indigent defendants to at least some state-funded expert assistance that is distinct from the federal right articulated in *Ake*. See *Williams v. Newsome*, 254 Ga. 714, 715-16 (334 SE2d 171) (1985) (finding it unnecessary to decide applicability of *Ake* because the Georgia Constitution provided independent and adequate state grounds for decision that criminal defendant was entitled to psychiatric examination).

of unrelated constitutional rights, what's to stop the State from requiring waivers of other rights? I see little reason why the State may require waiver of the rights to counsel of choice, but not, say, waiver of the rights against unreasonable searches or seizures, or waiver of the rights to a jury trial, or, for that matter, waiver of the rights to say things critical of the government.[16] And the dissent cites no decision from our Court or the United States Supreme Court requiring rejection of Duke's claim that he is constitutionally entitled to ancillary defense resources simply because he has secured lawyers to represent him pro bono, and I have found no such authority.[17]

---

[16] It seems to me that the State could make a pretty good case that the assertion of each of these rights creates inefficiencies of one kind or another. Or, at least, that requiring their waivers would generate more efficiencies than the State's attempt in this case to force Duke to accept state-funded counsel when he doesn't want it. Many of the most important provisions of the state and federal constitutions sacrifice efficiency for liberty. That's generally considered a feature, not a bug.

[17] I note that both the federal and Georgia constitutions embody robust rights to self-representation. See *Faretta v. California*, 422 U.S. 806, 821-32 (95 SCt 2525, 45 LE2d 562) (1975); *Oliver v. State*, 305 Ga. 678, 679-80 (2) (827 SE2d 639) (2019); see also Ga. Const. of 1983, Art. I, Sec. I, Par. XII ("No person shall be deprived of the right to prosecute or defend, either in person or by an attorney, that person's own cause in any of the courts of this state."). The dissent expressly reserves the question of whether an indigent defendant

The dissent alludes to limitations on the right to choice of counsel. In particular, "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *Gonzalez-Lopez*, 548 U.S. at 151. But this merely reflects that the scope of the right to state-funded appointed counsel does not include the right to choose your attorney. Again, in the criminal defense context, the right to counsel of choice is the right to choose "an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." *Caplin & Drysdale*, 491 U.S. at 624-25. And the right to appointed counsel is the indigent criminal defendant's right for the state to appoint for the defendant counsel at the state's expense and of the state's choosing. This right does not contain within it the right of an indigent defendant to choose the appointed lawyer. Duke is not asserting this right; it has nothing to do with

proceeding pro se (and thus rejecting public defenders) has a constitutional right to state-funded ancillary defense services. But I see no convincing reason for treating defendants exercising the right to self-representation differently from those exercising the right to counsel of choice.

this case. And so any relation this right may have to the due process right to ancillary services for indigent criminal defendants is wholly irrelevant to whether the State may condition those ancillary services on the waiver of the separate right to counsel of choice.

A few appellate courts in other jurisdictions have concluded that a state may constitutionally bundle together legal representation and ancillary defense services, such that an indigent defendant must accept a state-funded attorney in order to access other state-funded defense services. But these cases either assume that the right to state-funded ancillary defense services is a subsidiary of the right to counsel, or are otherwise poorly reasoned. For instance, in *State v. Earl*, 345 P3d 1153 (Utah 2015), the Utah Supreme Court framed the rights at issue as subsidiaries of the right to counsel, saying, "The constitutional right to counsel encompasses the prerogative of choosing counsel of one's choice and of receiving resources necessary to an adequate defense." Id. at 1158. Although the Utah court cited *Ake* for that proposition, *Ake* makes clear that the availability of funding for ancillary defense services involves a

right independently rooted in the Due Process Clause. See 470 U.S. at 76-83. This makes *Earl*'s bases for concluding that the federal constitution does not forbid denying public defense resources to an indigent defendant who opts out of public representation — that the right to choice of counsel is circumscribed, and an indigent defense is entitled to only the tools for an adequate defense, see 345 P3d at 1158-59 — particularly unsatisfying. A Colorado appellate decision, *People v. Thompson*, 413 P3d 306 (Colo. Ct. App. 2017), does no better. It assumes that because the Sixth Amendment right to counsel of choice does not confer a right to public funding to pay the defendant's chosen attorney, the right to counsel of choice "does not extend to indigent defendants who require courts to spend public funds to pay for their ancillary services." *Thompson*, 413 P3d at 317-18. Having offered up this unpersuasive syllogism that examined the issue solely through the Sixth Amendment lens, the court then attempted to grapple with the due process right to experts recognized in *Ake*, focusing on language in *Ake* to the effect that a defendant "did not have 'a constitutional right . . . to receive funds

to hire his own' experts." *Thompson*, 413 P3d at 319 (quoting *Ake*, 470 U.S. at 83). The Colorado decision thus fails to recognize that, even in the absence of public representation, the trial court may control the appointment of experts.[18]

Thankfully, we need not answer definitively today the question of whether Duke's pro bono representation means he is not constitutionally entitled to publicly funded expert defense services. But it may well be that Duke is correct that the nature of his relationship with his counsel does not preclude his access to such services. Now that the GPDC understands that it has the authority to contract with Duke's counsel and thereby provide funding for experts necessary to Duke's case, the GPDC would do well to do so,

---

[18] Another state appellate court decision holding that the federal constitution does not require providing experts to indigent criminal defendants represented by pro bono counsel relies heavily on a prior decision by the court about access to transcripts. See *Moore v. State*, 889 A2d 325, 344-46 (Md. Ct. App. 2005) (discussing *State v. Miller*, 651 A2d 845 (Md. Ct. App. 1994)). Although an indigent defendant's right to a free transcript may stem at least in part from the same due process right as the right to a publicly funded expert, see *Griffin*, 351 U.S. at 18-19, the prior Maryland decision did little analysis of the former issue before concluding that "[f]ailure to provide a free transcript to the indigent appellant cannot interfere with the right to choice of counsel where no such absolute right exists." *Miller*, 651 A2d at 853.

lest the already-considerable delays in bringing this case to trial grow even longer.

I am authorized to state that Justice Boggs and Justice Warren join in this concurrence.

S20A1522. DUKE v. THE STATE

B ETHEL, Justice, dissenting.

When the State charges an indigent person with a crime in Georgia, state and federal constitutional considerations require the State to ensure the defendant has access to competent and effective legal representation and appropriate defense resources at the expense of the State. See *Ake v. Oklahoma*, 470 U. S. 68, 76-83 (III) (A) (105 SCt 1087, 84 LE2d 53) (1985); *Strickland v. Washington*, 466 U. S. 668, 686 (II) (104 SCt 2052, 80 LE2d 674) (1984); *Britt v. North Carolina*, 404 U. S. 226, 227 (92 SCt 431, 30 LE2d 400) (1971); *Gideon v. Wainwright*, 372 U. S. 335, 339-345 (II) (83 SCt 792, 9 LE2d 799) (1963); *Roberts v. State*, 263 Ga. 764, 765 (1) (438 SE2d 905) (1994); *Lewis v. State*, 255 Ga. 101, 105 (3) (335 SE2d 560) (1985). The indigent defendant is not obligated to accept these publicly funded resources, but he effectively forfeits his constitutional right to private counsel of his own choosing while he uses the publicly funded resources. See *United States v. Gonzalez-Lopez*, 548 U. S. 140, 151 (IV) (126 SCt 2557, 165 LE2d 409) (2006)

("[T]he right to counsel of choice does not extend to defendants who require counsel to be appointed for them." (citations omitted)).

Similarly, reliance on public funding for defense resources results in the State taking responsibility for selection and engagement of those resources. See *Ake*, 470 U. S. at 83 (III) (A) (noting that states have discretion with regard to how to provide counsel and expert assistance to indigent defendants). Provided the State's indigent defense system satisfies constitutional requirements relative to the rights to counsel and due process, the State is allowed to manage an indigent defendant's access to publicly funded legal representation and defense resources according to its own preferences and priorities. See id. The State must, at least, retain this same discretion when an indigent defendant has elected to use the services of private legal counsel. That is to say, an indigent defendant who secures free, substantially discounted, or third-party funded private representation cannot thereby obtain more rights over the selection, management, and funding of ancillary defense

resources than a defendant being represented by state-appointed counsel.

In this case, Duke questions the constitutionality of the indigent-defense statutes enacted by the General Assembly. Of course, the Georgia Constitution vests "[t]he legislative power of the state" in the General Assembly, Ga. Const. of 1983, Art. III, Sec. I, Par. I, and as we have explained, the lawmaking power of the General Assembly is "plenary." *Bryan v. Ga. Public Service Comm.*, 238 Ga. 572, 573 (234 SE2d 784) (1977); see also *Sears v. State of Ga.*, 232 Ga. 547, 553-554 (3) (208 SE2d 93) (1974) ("The inherent powers of our State General Assembly are awesome . . . . [The General Assembly] is absolutely unrestricted in its power to legislate, so long as it does not undertake to enact measures prohibited by the State or Federal Constitution." (citation omitted)).

For that reason, when this Court is asked to consider the constitutionality of an act of the General Assembly, we begin with a strong presumption that it is a proper exercise of the legislative power. See *Service Employees Int'l Union v. Perdue*, 280 Ga. 379, 380

45

(628 SE2d 589) (2006). This presumption can only be overcome by a showing of a "clear and palpable" conflict with either the United States Constitution or the Georgia Constitution. (Citation omitted.) *JIG Real Estate, LLC v. Countrywide Home Loans, Inc.*, 289 Ga. 488, 490 (2) (712 SE2d 820) (2011). The burden is on the party alleging that a statute is unconstitutional to demonstrate as much. See *Dee v. Sweet*, 268 Ga. 346, 348 (1) (489 SE2d 823) (1997).

With respect to the statutory provisions providing for indigent legal representation and ancillary defense services, I have concluded that the strong presumption of constitutionality has not been overcome in this case by a showing of a "clear and palpable" conflict with the United States Constitution or the Georgia Constitution. Thus, because Duke has not shown that the State of Georgia deprived him of access to counsel and indigent defense services guaranteed by the United States Constitution or the Georgia Constitution, I would affirm.

Although the State of Georgia is obligated to provide indigent legal services, it is not obligated to provide such services on terms

agreeable to the indigent defendant. See *Gonzalez-Lopez*, 548 U. S. at 151 (IV); *Ake*, 470 U. S. at 83 (III) (A); *Lewis*, 255 Ga. at 105 (3). Where, as here, an indigent defendant has elected to be represented by private counsel, the State may — but is not required to — pursue a contractual relationship with the defendant's chosen counsel to provide public resources to aid the defense. See OCGA §§ 17-12-5 (b) (3) (permitting the Georgia Public Defender Council ("GPDC") to contract with outside consultants to provide indigent defense services); 17-12-31 (a) (authorizing circuit public defenders to employ attorneys and independent contractors, as resources and local law allow, to provide indigent defense services). And Georgia law allows circuit public defenders and the GPDC to pursue such arrangements with outside attorneys and other professionals not employed by their agencies, including attorneys who otherwise engage in private law practice. See id; see also OCGA §§ 17-12-2 (8) (defining "public defender" as "an attorney who is employed in a circuit public defender office or who represents an indigent person pursuant to [the Georgia Indigent Defense Act of 2003]."); 17-12-33

47

(a) (providing that only attorneys who are employed full time by the circuit public defender and who are compensated, in whole or in part, with state funds are ineligible to engage in the private practice of law). However, other than the avoidance of a legal conflict of interest, neither constitutional constraints nor state law *compels* those agencies to do so.[19]

Where a defendant has eschewed legal representation by the circuit public defender or the GPDC, those agencies do not have *any* constitutional or statutory *obligation* to provide funding for ancillary defense services to the defendant, even when he is indigent.[20] My review of decisions of the Supreme Court of the United States and this Court leads me to conclude that the rights to counsel and ancillary defense services guaranteed by the Sixth

---

[19] The Indigent Defense Act specifically requires the GPDC to enter into a contractual agreement with an "attorney who is not employed by the circuit public defender office" in the event such attorney is appointed to represent an indigent defendant in a case in which the circuit public defender office has a conflict of interest. See OCGA § 17-12-22 (b). Such attorneys must meet the requirements for training, experience, qualifications, and standards of representation established by the GPDC. See OCGA § 17-12-22 (c).

[20] I agree with the majority that the participation of pro bono counsel, alone, does not impact Duke's indigency status.

Amendment and Fourteenth Amendment to the United States Constitution and Article I, Section I, Paragraphs I and XIV of the Georgia Constitution of 1983 do not impose such a requirement on indigent defense agencies.[21] Neither are states prohibited from linking indigent legal representation and ancillary services in an "all or nothing" option for represented defendants.[22] See *Ake*, 470 U. S. at 83 (III) (A) ("Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have

---

[21] The well-reasoned and citation-rich concurrence takes issue with the lack of citation to authority for this proposition, but provides no explanation for its failure to include authority for the inverse proposition. There is no dispute that the right to counsel and the due process right to ancillary defense services are prized rights under both the United States Constitution and the Georgia Constitution. The question presented is what the State of Georgia must do to ensure those rights for indigent defendants. Given the broad discretion the decisions of the United States Supreme Court confer on states and the absence of any binding authority to the contrary, I conclude that packaging of these indigent defense services is not a violation of either the right to counsel or the right to due process.

[22] My consideration in this respect is limited to represented defendants, and I express no view on how such considerations would apply to a self-represented defendant. The concurrence suggests a lack of a principled distinction in this caveat. On the contrary, my view is that the State could provide the ancillary defense services to a self-represented defendant on far better, and arguably preferable, terms through a public defender than through a private attorney not subject to the state agency's management. Moreover, the competing interests would be demonstrably different for a defendant seeking to access these ancillary defense services of the State without accessing State-funded counsel. No contractual or other special relationship would need to be formed to allow such a defendant to be a client or customer of the state agency.

discussed, and as in the case of the provision of counsel we leave to the State the decision on how to implement this right."); *Lewis*, 255 Ga. at 105 (3) (no violation of due process clauses of the United States Constitution or the Georgia Constitution where trial court followed local procedure for appointing counsel for indigent defendant and there was no showing that counsel was unqualified or ineffective). Moreover, as the majority notes in its opinion, OCGA §§ 17-12-5 (b) (3) and 17-12-31 (a) clearly contemplate that circuit public defenders and the GPDC may make funds available to indigent defendants who are not represented by those agencies at their discretion, to the extent resources and local law allow. But nothing obligates them to do so.[23]

---

[23] The concurrence complains that I have provided no support for the proposition that the State can make provision of ancillary defense resources dependent upon utilization of a public defender. But the concurrence seems comfortable with the State conditioning those resources on a requirement that the defendant's self-selected attorneys give up their independence by contracting with the State as a precondition to receiving funding for the services. Once bound to the State in such a contract, the "private" counsel has clearly established a contractual relationship with the State and, for all intents and purposes, has become a public defender.

In short, the General Assembly has elected to provide indigent legal representation and ancillary defense resources in what amounts to a "one stop shop" for indigent defendants. While certainly subject to criticism, I do not think this choice by the General Assembly violates the United States Constitution or the Georgia Constitution. I agree with the majority's analysis of the availability of contractual options for public funding of defense resources for indigent defendants not represented by the circuit public defender or the GPDC. I also agree with Duke and some of our amici that there are a whole host of public policy justifications for a State to discharge its constitutional obligations regarding indigent defense with greater flexibility than the system currently in place in Georgia requires. But the General Assembly makes that policy choice in Georgia, and its choice controls as long as it complies with the applicable constitutional standards. See *Ake*, 470 U. S. at 83 (III) (A); *Sears*, 232 Ga. at 553-554 (3).

The Georgia model provides that in cases like this where an indigent defendant has chosen private representation, such counsel

51

may be brought under the umbrella of either the circuit public defender or the GPDC, respectively, for purposes of the specific contract-covered case. To utilize public resources for the defense, such counsel must contract in some way with the relevant indigent defense agency on terms agreeable to the agency. Once subject to such a contract, the private counsel is essentially converted to a public defender for purposes of the case covered by the contract. Absent such arrangement, public funds are simply not available to an indigent defendant in Georgia who is represented by private counsel of his choice. Stated differently, Georgia requires indigent defendants seeking the benefit of public resources for their defense to either use a single system (which may include a private attorney contracting with the State) or venture forth on their own.[24] Duke

___

[24] The concurrence complains about the lack of a limiting principle for my analysis of this issue and suggests that my view opens the door for the State to coerce or force the defendant into making other concessions or difficult choices. But the link here is, obviously, the State action required to directly fund indigent defense. The State is obligated to satisfy a defendant's right to counsel and the right to ancillary defense services even though these rights spring from different provisions of the United States Constitution and the Georgia Constitution. The difference between the State saying it will provide indigent defense services (whether legal or ancillary) in a single package and

identifies this as a difficult Hobson's choice, and I wholeheartedly agree that there is potential for a difficult choice. I simply do not think it is an unconstitutional choice.

The record in this case makes clear that Duke, through his private counsel, has not yet elected to pursue a contractual relationship with either the circuit public defender or the GPDC through which Duke could receive public funds to assist his private counsel in his defense. Such a path seems worthy of exploration, but I do not believe it to be constitutionally required, either on the part of his counsel or the relevant State agencies.[25] Even were Duke to

---

the State predicating the provision of defense resources on a defendant's waiver of search and seizure protections seems plain to me.

[25] The Court appears to avoid deciding the constitutional questions presented here by sending the case back to compel Duke to pursue an available statutory remedy. That is an understandable choice. But, in doing so, I believe we send mixed messages to the circuit public defender, the GPDC, and the trial court. I fear the message of our opinion will be that either the circuit public defender, the GPDC, or both, are obligated to enter into a contract with Duke's private attorneys. But, it is not so. Inevitably, there will be counsel and other professionals with whom circuit public defenders and the GPDC would rather not be affiliated or who fail or refuse to meet the contracting requirements of those agencies providing indigent defense services. Then we will be called upon to decide this question as well as how much the State is constitutionally required to give in contractual negotiations with outside service providers. But the General Assembly has already made that determination. The State *may* give if it is so inclined, but is not required to meet the demands of an indigent

make such efforts through his counsel at some point in this case, I see no constitutional requirement compelling those agencies to agree to a contract with Duke's private counsel. And absent such contract, the agencies are not compelled to provide Duke with any funding for ancillary services so long as he continues to be represented by private counsel unaffiliated with a state indigent defense agency.

For these reasons, I would affirm the judgment of the trial court. Thus, I respectfully dissent.

---

defendant who has elected not to be represented by an attorney employed by the relevant agency. I read the cases as requiring the State to provide reasonable access to competent services in the manner it deems appropriate. While I may not have constructed this model if I was the policy maker, I view it as discharging the obligations identified in the case law.