**THIRD DIVISION
DOYLE, P. J.,
REESE, J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**June 17, 2022**

# In the Court of Appeals of Georgia

A22A0204. HICKS et al. v. UNIVERSAL HEALTH SERVICES, INC. et al.

A22A0205. UNIVERSAL HEALTH SERVICES, INC. v. HICKS et al.

DOYLE, Presiding Judge.

These appeals arise following the partial dismissal of wrongful death claims brought by parents in their individual and estate administrator capacities against Universal Health Services, Inc. ("UHS"); UHS of Delaware, Inc. ("UHS Delaware"); UHS of Anchor, LP, d/b/a Crescent Pines Hospital and Anchor Hospital ("the Hospital"); Psychiatric Solutions, Inc.; Dr. Arun Kantamneni; and Arun K. Kantamneni MD, Inc. The claims are based on the deaths of the plaintiffs' adult children, Matthew Hicks, Destiny Olinger, and Sophia Bullard, who were shot and killed by Jacob Kosky after he allegedly received improper mental health treatment

from the defendants.[1] In Case No. A22A0204, the plaintiffs appeal from the dismissal of their survivor/non-estate wrongful death claims, arguing that the trial court erred by ruling that the two-year statute of limitation was not tolled by OCGA § 9-3-99 ("the Tolling Statute"), which pauses the statute of limitation for tort claims brought by crime victims while the criminal prosecution is pending. In Case No. A22A0205, defendant UHS cross-appeals the trial court's denial of its motion to dismiss for lack of personal jurisdiction under Georgia's Long Arm Statute.[2] For the reasons that follow we affirm in Case No. A22A0204, and we reverse in Case No. A22A0205.

*Factual and Procedural Background*

The record shows that in January 2021, the parents initiated the present actions seeking damages arising from the shooting deaths of their children.[3] The complaints alleged that in October 2016, 24-year-old Kosky, who had a mental health history that

---

[1] A fourth victim, Keith Gibson, allegedly was also killed, but his representative is not a party to this appeal.

[2] OCGA § 9-10-91.

[3] For purposes of addressing the partial motion to dismiss, we take as true the allegations of the complaints. See generally *Gardei v. Conway*, 313 Ga. 132, 133 (868 SE2d 775) (2022) ("Because we are reviewing an order on a motion to dismiss, we accept as true the well-pled material allegations of [the] amended petitions and resolve any doubts in [the plaintiffs'] favor.").

included suicidal and homicidal ideations, was involuntarily admitted to Crescent Pines, an in-patient mental health treatment facility owned and operated by certain corporate defendants, and evaluated by Dr. Kantamneni. According to the complaint, despite Dr. Kantamneni's recognition that Kosky was a danger to himself and others, Kosky was discharged three days later without adequate supervision or treatment. On October 26, 2016, 11 days after his discharge, Kosky attended a bonfire gathering with his sister, and following a dispute, he briefly left the gathering, later returning with a firearm; Kosky then shot and killed Hicks, Bullard, Olinger, and Gibson.[4] Kosky pleaded guilty but mentally ill on February 8, 2019.[5]

More than four years after the shooting, on January 5 and 6, 2021, the parents of Hicks, Bullard, and Olinger filed the present actions, which later were consolidated for purposes of this appeal. The parents sued in their capacities as individuals (i.e., surviving parents) and as administrators of their children's estates, enumerating claims for ordinary and professional negligence, negligence per se, and wrongful

---

[4] The complaints also allege the involvement of a second gunman who is not a party to this litigation.

[5] The criminal case against the second alleged gunman was still pending at the time the complaints were filed.

death.[6] The complaints, in part, broke down the damages sought: (a) based on the children's estates' claims for pre-death pain and suffering, hospital bills, and funeral expenses ("Estate claims"); and (b) based on the parents' wrongful death claims as survivors seeking the full value of the lives of their children ("Survivor claims").[7]

After the defendants filed answers, in February 2021, Kantamneni moved to dismiss as untimely the Survivor claims for wrongful death but not the Estate claims. UHS Delaware and the Hospital joined Kantamneni's motion. The moving defendants noted that the complaints were not filed within the two-year statute of limitation for personal injury torts,[8] and the statute of limitation was not tolled by OCGA § 9-3-99. That Code section extends the statute of limitation "with respect to any cause of

---

[6] The complaints also alleged theories of recovery against the corporate defendants based on agency, joint venture, and alter ego.

[7] See generally *Bibbs v. Toyota Motor Corp.*, 304 Ga. 68, 72 n. 6 (2) (815 SE2d 850) (2018) ("The non-abatement statute [OCGA § 9-2-41] allows the victim's estate to bring . . . a personal injury action against the wrongdoer, while the wrongful death statute allows the victim's spouse or children to bring an independent action for wrongful death."), citing *Mays v. Kroger Co.*, 306 Ga. App. 305, 306 (701 SE2d 909) (2010) ("[A] survivor's statutory claim for a decedent's wrongful death and an estate's common-law claim for the same decedent's pain and suffering are distinct causes of action.").

[8] See OCGA § 9-3-33; *Williams v. Alvista Healthcare Center, Inc.*, 283 Ga. App. 613, 617 (2) (642 SE2d 232) (2007) (noting two-year statute of limitation for wrongful death claims).

4

action in tort that may be brought by the victim of an alleged crime which arises out of the facts and circumstances relating to the commission of"[9] the crime.

Following the parties' briefing of the issue, the trial court granted the motion to dismiss the Survivor claims, noting that the Estate claims remained viable. The trial court explained that the parents could not invoke the Tolling Statute because they were not victims of a crime. The trial court certified its ruling for immediate review, and the parents now appeal that ruling in Case No. A22A0204.

Meanwhile, in March 2021, UHS appeared specially and moved to dismiss for lack of personal jurisdiction.[10] Finding that UHS and its operations met the criteria for Georgia Long Arm jurisdiction and that Due Process notions of fairness were not violated, the trial court held that it had personal jurisdiction over UHS. UHS appeals that ruling in Case No. A22A0205.

*Case No. A22A0204*

---

[9] OCGA § 9-3-99.

[10] Psychiatric Solutions, Inc., also specially appeared and moved to dismiss for lack of personal jurisdiction. Psychiatric Solutions, Inc., later was dismissed without prejudice pursuant to a consent order.

5

1. The parents contend that the trial court erred by ruling that OCGA § 9-3-99 does not toll the two-year statute of limitation with respect to the Survivor claims. That Code section provides in full:

> The running of the period of limitations *with respect to any cause of action in tort that may be brought by the victim of an alleged crime* which arises out of the facts and circumstances relating to the commission of such alleged crime committed in this state shall be tolled from the date of the commission of the alleged crime or the act giving rise to such action in tort until the prosecution of such crime or act has become final or otherwise terminated, provided that such time does not exceed six years, except as otherwise provided in Code Section 9-3-33.1 [pertaining to childhood sexual abuse].[11]

The parents argue that the trial court too narrowly defined the term "victim," and incorrectly concluded that their Survivor claims fall outside the scope of those claims covered by the Tolling Statute. We disagree.

Our analysis is governed by the familiar rules of statutory construction.

When we consider the meaning of a statute, we must presume that the General Assembly meant what it said and said what it meant. To that end, we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we

---

[11] (Emphasis supplied.)

6

must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would.[12]

> The common and customary usages of the words are important, but so is their context. For context, we may look to the other provisions of the same statute, the structure and history of the whole statute, and the other law — constitutional, statutory, and common law alike — that forms the legal background of the statutory provision in question.[13]

"When we construe [a statute] on appeal, our review is de novo."[14]

The dispositive question on appeal is whether a wrongful death claim brought by a surviving parent to recover the value of the life of a child who was fatally shot is a "cause of action in tort that may be brought by the victim of an alleged crime."[15] This statutory language appears in an article of the Code that sets out the various types of tolling provisions generally applicable to statutes of limitation in civil

---

[12] (Citations and punctuation omitted.) *Deal v. Coleman*, 294 Ga. 170, 172-173 (1) (a) (751 SE2d 337) (2013).

[13] (Citations and punctuation omitted.) *Tibbles v. Teachers Retirement System of Ga.*, 297 Ga. 557, 558 (1) (775 SE2d 527) (2015). See also *Stubbs v. Hall*, 308 Ga. 354, 365 (4) (840 SE2d 407) (2020).

[14] *In the Interest of K. S.*, 303 Ga. 542, 544 (814 SE2d 324) (2018).

[15] OCGA § 9-3-99.

7

actions.[16] The Code does not define the term "victim" in this area, "so we look to the ordinary meaning of that word in context."[17]

In ordinary usage, the word "victim" is defined as "one that is acted on and usually adversely affected by a force or agent," and "one that is injured [or] destroyed . . . under any of various conditions [such as a car crash or murder]."[18] Black's Law Dictionary defines the term as "[a] person harmed by a crime, tort, or other wrong."[19] In a vague sense, it could be said that the harm of a shooting extends beyond the person shot,[20] but the ordinary dictionary definition is consistent with a natural and

---

[16] The language was added to the Code in 2005 as part of the Crime Victims Restitution Act of 2005. That act also amended other Code sections in Title 17 pertaining to criminal procedure. See Ga. L. 2005, p. 88, § 2.

[17] *Roberts v. Unison Behavioral Health*, 312 Ga. 438, 443 (2) (b) (863 SE2d 99) (2021), citing *Duke v. State*, 311 Ga. 135, 140 (2) (a) (856 SE2d 250) (2021) ("When interpreting a statute, we must give the text its plain and ordinary meaning, view it in the context in which it appears, and read it in its most natural and reasonable way, while also giving meaning to all words in the statute.").

[18] Merriam-Webster Dictionary (accessed June 1, 2022), https://www.merriam-webster.com/dictionary/victim.

[19] Black's Law Dictionary, 11th ed. (2019).

[20] See, e.g., *Carringer v. Rodgers*, 276 Ga. 359, 365 (578 SE2d 841) (2003) ("[I]t cannot be credibly argued that an aging parent losing an adult child is not damaging to the social and economic order, a primary concern of the wrongful death laws.").

reasonable understanding of the term as referring to the person who is "acted on," i.e., the person shot by the shooter. Put succinctly, the crime at issue here is murder, and the parents have not been murdered. Under this natural construction, the parents are not victims of the crime of murder.

Looking to other Code sections, we note that when the term is used elsewhere and not specifically defined, the word "victim" is used in its ordinary sense — referring to the person acted on — and is distinct from family members or others who may nevertheless experience indirect harm. For example, with respect to victim notification in OCGA § 17-10-1.1 (a), "[a] prosecuting attorney bringing charges against a defendant shall notify, where practical, *the alleged victim or, when the victim is no longer living, a member of the victim's family* of his or her right to submit a victim impact form."[21] And in OCGA § 17-10-1.2, "[i]n all cases in which the death penalty may be imposed, . . . the court shall allow evidence from *the family of the victim*."[22] The "victim" is distinct from "the family of the victim."

---

[21] (Emphasis supplied.)

[22] (Emphasis supplied.) Similarly, OCGA § 17-10-1.2 (b) also refers to the various parties as "the victim, the family of the victim, or such other witness having personal knowledge of the impact of the crime on the victim, the victim's family, or the community. . . ."

Similarly, with respect to victim compensation under OCGA § 17-15-7 (b), "[a] surviving spouse, parent, step-parent, child, or step-child who is legally dependent . . . upon a deceased *victim* shall be entitled to file a claim under this chapter if the deceased *victim* would have been so entitled. . . ."[23] In each of these instances, reading the word "victim" to include people not directly acted upon is unnatural and would render the references to surviving family members mere surplusage, which is a construction that we avoid.[24] So, when not otherwise defined, the word "victim" has been used by the General Assembly in the ordinary sense and has not included people who were not the direct objects of the crime, particularly if the victim is deceased. In these other instances in which the General Assembly intended to include people indirectly impacted such as family members or dependents, it made explicit references to those people.

---

[23] (Emphasis supplied.) OCGA § 17-15-2 provides definitions for the victim compensation chapter, but the word victim is not defined.

[24] See *Currid v. DeKalb State Court Probation Dept.*, 285 Ga. 184, 187 (674 SE2d 894) (2009).

10

Further, despite not defining the term "victim" in the Tolling Statute, the General Assembly has defined it elsewhere. For example, in the Crime Victims' Bill of Rights,[25] the legislature defined "victim" as follows:

(A) A person against whom a crime has been perpetrated or has allegedly been perpetrated; or

(B) In the event of the death of the crime victim, the following relations if the relation is not either in custody for an offense or the defendant:

(i) The spouse;

(ii) An adult child if division (i) of this subparagraph does not apply;

(iii) A parent if divisions (i) and (ii) of this subparagraph do not apply;

(iv) A sibling if divisions (i) through (iii) of this subparagraph do not apply; or

(v) A grandparent if divisions (i) through (iv) of this subparagraph do not apply; or

---

[25] OCGA § 17-17-1 et seq.

(C) A parent, guardian, or custodian of a crime victim who is a minor or a legally incapacitated person except if such parent, guardian, or custodian is in custody for an offense or is the defendant.[26]

Likewise, with respect to restitution to crime victims, OCGA § 17-14-2 (9) also defines victim with more detail:

"Victim" means any:

(A) Natural person or his or her personal representative or, if the victim is deceased, his or her estate; or

(B) Any firm, partnership, association, public or private corporation, or governmental entity

suffering damages caused by an offender's unlawful act; provided, however, that the term "victim" shall not include any person who is concerned in the commission of such unlawful act. . . .

And the term "damages" specifically includes damages from a wrongful death action.[27]

---

[26] OCGA § 17-7-3 (11).

[27] See OCGA § 17-14-2 (2).

But in each of these cases where the term was defined, the General Assembly was explicit that these more detailed definitions apply only for purposes of the article or chapter in which they appear (which does not include the general tolling provisions in Title 9 of the Code). This Court previously has said that if the General Assembly demonstrates a clear intent to define a term in one place and does not so define it in another, we do not import the definition where it has not been used.[28] It stands to reason, therefore, that these more detailed definitions do not apply where they do not appear, and the legislature did not otherwise demonstrate an intent to expand the reach of the Tolling Statute beyond the ordinary sense of "the victim of an alleged crime," i.e., the person against whom a crime was perpetrated.

We are left with language that, on its face, is plain. The fact that the statute does not define the term "victim" does not make the statute ambiguous in this case, it just means that we apply the ordinary meaning of the term.[29] The parents were not shot, so they are not the victims of this crime. The victims of the crime are deceased,

---

[28] See *Harrison v. McAfee*, 338 Ga. App. 393, 399 (788 SE2d 872) (2016) ("The General Assembly knows how to limit the sort of civil defendants to which a statute applies, when it wishes to do so. But it did not do so here, leading us to conclude that it did not intend to limit the statute's reach to claims against only a certain subset of civil defendants.").

[29] See id..

13

so they cannot bring the present wrongful death claims. Thus, given the clear and unambiguous statutory text, our search for meaning ends:[30] the Tolling Statute does not apply to the Survivor claims brought by the parents of the crime victims in this case.[31]

Looking more broadly to the legal context, this interpretation squares with the nature of a wrongful death claim, which is, by definition, not a claim "that may be brought by"[32] the decedent. As explained by the Georgia Supreme Court, "the cause of action for wrongful death belongs to the decedent's survivors and benefits them directly," even though the damages for the value of the decedent's life are measured from the perspective of the decedent (not the parent).[33] Our case law is clear that

---

[30] See *Deal*, 294 Ga. at 173 (1) (a) ("[I]f the statutory text is 'clear and unambiguous,' we attribute to the statute its plain meaning, and our search for statutory meaning is at an end.").

[31] The plaintiffs point to other cases involving this Court's interpretation of OCGA § 9-3-99, see, e.g., *DeKalb Med. Center, Inc. v. Hawkins*, 288 Ga. App. 840, 847 (2) (b) (655 SE2d 823) (2007) (discussing OCGA § 9-3-99 in dicta), criticized by *Harrison*, 338 Ga. App. at 396 (2) (a), but they concede that this Court has never directly ruled on the question presented here.

[32] OCGA § 9-3-99.

[33] See *Bibbs*, 304 Ga. at 73 (2) ("[T]he statute confers a right of action *on the survivors of a decedent*, but only to recover damages for injuries suffered by the decedent — as measured from her perspective — not damages for the

14

despite any commonality in the damages sought, the cause of action itself belongs to

the surviving parent, not the victim.[34] Therefore, the Survivor claims are not "cause[s]

---

separate-but-related loss sustained by the survivors themselves.") (emphasis supplied).

[34] See id.

of action in tort that may be brought by the victim of an alleged crime,"[35] and the trial

court correctly held that the Survivor claims were untimely filed.[36]

---

[35] OCGA § 9-3-99. Amicus curiae argue that wrongful death claims are "wholly derivative" of the decedent's right of action, so the parents should be deemed to stand in the shoes of the decedents and benefit from the tolling statute as the victims of the crimes. See, e.g., *United Health Svcs. of Ga., Inc. v. Norton*, 300 Ga. 736, 738 (2) (797 SE2d 825) (2017) ("[B]ecause wrongful death claims are wholly derivative, all defenses which could have been made against a decedent also bind the beneficiaries when they pursue a wrongful death claim."). But this characterization is made in the context of cases in which the decedent compromised her claim during her life, which compromise later was deemed to bind related plaintiffs bringing wrongful death claims based on the same events. See *Bibbs*, 304 Ga. at 77 ("Bibbs cannot (again) recover damages against Toyota for her personal injuries to the extent that those [claims] were [settled] in her earlier personal injury lawsuit, and if she cannot recover, neither can her survivors."); *Norton*, 300 Ga. at 739 (2) (holding that a wrongful death plaintiff was bound by the decedent's prior agreement to arbitrate any claims against the defendants). Therefore, the "derivative" nature of the claim does not mean that the plaintiffs themselves are equivalent to the victims in this case; the *cause of action* is related, but *the party* to whom it belongs is different. For example, a loss of consortium claim is "derivative" of a tort victim's claim, see *Behforouz v. Vakil*, 281 Ga. App. 603, 604 (636 SE2d 674) (2006) (grant of summary judgment on loss of consortium claim was also proper because the claim was derivative of personal injury claims), but this derivative nature does not mean that the consortium claim belongs to the tort victim. Rather, it is personal to the consortium claimant.

[36] We note that it would be better policy to include similarly situated wrongful death plaintiffs within the scope of the Tolling Statute. This would allow such wrongful death plaintiffs to file an action without, for example, having to seek a stay during a criminal proceeding. But in light of the current statutory text, this is a remedy that must be afforded by the legislature. See *Morrison v. Claborn*, 294 Ga. App. 508, 513 (2) (669 SE2d 492) (2008) ("[T]his Court has authority only to interpret statutes, not to rewrite them. . . . Changing the law is a duty for the General Assembly to undertake. . . .") (citation omitted); *Butler v. State*, 207 Ga. App. 824,

16

2. In this case, UHS appeals from the denial of its motion to dismiss for lack of personal jurisdiction. UHS is the holding company for UHS Delaware and the Hospital (also called UHS of Anchor, LP, d/b/a Crescent Pines Hospital and Anchor Hospital). UHS contends that the trial court erred by concluding that it could exercise personal jurisdiction over UHS under the Georgia Long Arm Statute,[37] and by considering certain exhibits proffered by the plaintiffs to do so. Because we conclude that the trial court erred by ruling that the plaintiffs had met their burden, we reverse.

> A motion to dismiss for lack of personal jurisdiction must be granted if there are insufficient facts to support a reasonable inference that the defendant can be subjected to the court's jurisdiction. [UHS], as the defendant moving to dismiss, bears the burden of proving lack of jurisdiction. And to the extent that defendant's evidence controverts the allegations of the complaint, plaintiff may not rely on mere allegations, but must also submit supporting affidavits or documentary evidence.

---

826 (429 SE2d 280) (1993) ("We will hold that the legislature intended nothing beyond what their language, in its fair and usual meaning, will indicate; and, if the terms of their enactment have not embraced the object contended for, the power is with them, by additional Act or Acts, to extend them.") (punctuation omitted).

[37] OCGA § 9-10-91.

17

Where as here, the motion was decided on the basis of written submissions alone, any disputes of fact in the written submissions supporting and opposing the motion to dismiss are resolved in favor of the party asserting the existence of personal jurisdiction, and the appellate standard of review is nondeferential.[38]

UHS asserts that as the holding company, it lacks sufficient contact with Georgia to support the exercise of personal jurisdiction under the Long Arm Statute, OCGA § 9-10-91. That statute provides, in relevant part:

A court of this state may exercise personal jurisdiction over any nonresident . . . as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he or she were a resident of this state, if in person or through an agent, he or she:

(1) Transacts any business within this state;

(2) Commits a tortious act or omission within this state, . . . ;

(3) Commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial

---

[38] (Citations and punctuation omitted.) *Drumm Corp. v. Wright*, 326 Ga. App. 41 (755 SE2d 850) (2014).

18

revenue from goods used or consumed or services rendered in this state.
. . .

With respect to transacting business in Georgia,

[j]urisdiction exists . . . if [1] the nonresident defendant has purposefully done some act or consummated some transaction in this state, [2] if the cause of action arises from or is connected with such act or transaction, and [3] if the exercise of jurisdiction by the courts of this state does not offend traditional fairness and substantial justice.[39]

As a threshold matter, we note that the corporate structure established in this case is not unusual. Further,

[i]t is well established that as long as a parent and a subsidiary are separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other. Generally, a foreign parent corporation is not subject to the jurisdiction of a forum state merely because a subsidiary is doing business there. Where the subsidiary's presence in the state is primarily for the purpose of carrying on its own business and the subsidiary has preserved some semblance of independence from the parent, jurisdiction over the parent may not be acquired on the basis of the local activities of the subsidiary.[40]

---

[39] (Citation and punctuation omitted.) *Robertson v. CRI, Inc.*, 267 Ga. App. 757, 759 (601 SE2d 163) (2004).

[40] (Citations and punctuation omitted.) *Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F3d 1286, 1293 (III) (11th Cir. 2000).

Here, the trial court relied on the evidentiary submissions provided by the parties. UHS submitted an affidavit by Michelle Carson, senior counsel for UHS Delaware, which is a subsidiary of UHS that manages other UHS subsidiaries that operate healthcare facilities, including the Hospital. The Carson affidavit averred that UHS Delaware is the management company for UHS, which is incorporated under the laws of Delaware, with a principal place of business in Pennsylvania. UHS functions only as a holding company that has no actual day-to-day operations. The healthcare facility that treated Kosky is owned and operated by UHS of Anchor, L.P., which is an indirect subsidiary of UHS. UHS of Anchor is licensed in Georgia to provide healthcare services and does business as the Crescent Pines Hospital. According to the affidavit, UHS does not have any employees, is not registered to do business in Georgia, is not a licensed healthcare provider, does not provide healthcare services, and is not involved in the day-to-day operations of UHS of Anchor. Simlarly, UHS does not dictate staffing levels or have any involvement in hiring or training of UHS of Anchor employees.

Despite this evidence, the trial court found that UHS conducted "a great deal of business" in Georgia, relying on the following facts: it applied for a certificate of

need ("CON") in 2008 to open the Crescent Pines Hospital,[41] it disclosed substantial revenue generated in Georgia in its annual report and corporate 10-K filing, it commingled employees between UHS and its Georgia subsidiaries, and it engaged a lobbyist in Georgia.

First, with respect to the CON application, the application on its face is clear that the applicant is UHS of Crescent Pines — UHS is listed only as a "parent company." Likewise, UHS of Crescent Pines is listed as the legal owner of the facility as well as the operator of the facility. The application further explains that UHS "is the owner of UHS of Georgia Holdings, Inc., which is the sole member of UHS Crescent Pines, LLC." Thus, according to the CON application, UHS is two corporate entities removed from the owner and operator of the Hospital. This is entirely consistent with the averments in the Carson affidavit that UHS is a holding company

---

[41] See generally *Surgery Center, LLC v. Hughston Surgical Institute, LLC*, 293 Ga. App. 879, 880 (668 SE2d 326) (2008) (physical precedent only) (explaining that "new institutional health services . . . are required to obtain a certificate of need from the Department" of Community Health) (punctuation omitted).

and has no operations in Georgia.[42] Based on the information in the CON application, the trial court erred by concluding otherwise.

Next, with regard to the annual report and Form 10-K statements regarding revenue generated by operations in Georgia, these documents reflect the same discrete corporate structure outlined in the CON application and Carson affidavit. For example, the UHS annual report explains the structure plainly:

> UHS is a registered trademark of UHS of Delaware, Inc[.], the management company for Universal Health Services, Inc.[,] and a wholly owned subsidiary of Universal Health Services. Universal Health Services, Inc.[,] is a holding company and operates through its subsidiaries including its management company, UHS of Delaware, Inc. All healthcare and management operations are conducted by subsidiaries of Universal Health Services, Inc. Any reference to "UHS or UHS facilities" . . . which relates to healthcare or management operations is referring to Universal Health Services' subsidiaries including UHS of Delaware. Further, the terms "we," "us," "our" or "the company" in such context similarly refer to the operations of Universal Health Services' subsidiaries including UHS of Delaware. Any reference to employment at UHS or employees of UHS refers to employment with one of the

---

[42] See generally *Porter v. Wootten*, 51 Ga. App. 834, 839-840 (181 SE 866) (1935) ("The fact that one corporation owns the entire capital stock of another does not render the two corporations identical. On the contrary they are separate and distinct legal entities. Two corporations do not become merged into each other merely because the stock in each was owned by the same persons.") (citation omitted).

22

subsidiaries of Universal Health Services, Inc., including its management company, UHS of Delaware, Inc.

The Form 10-K contains nearly identical language explaining the corporate structure and the context for statements regarding UHS throughout that document. Based on this language in the annual report and Form 10-K, it cannot be said that generalized statements about UHS investment in or revenue derived from Georgia reflect any operations actually conducted by UHS as opposed to its subsidiaries.

Next, with respect to alleged "commingling" employees of UHS and its subsidiaries, the Carson affidavit establishes that UHS does not have employees, and to the extent that UHS shares any officers with its subsidiaries, "the separate identity of a subservient corporation is not destroyed merely by the fact that it is used by the parent for the parent's ends, or even by the fact that they have the same officers and offices."[43]

---

[43] (Citation and emphasis omitted.) *Trans-American Communications v. Nolle*, 134 Ga. App. 457, 459-460 (1) (a) (214 SE2d 717) (1975). The plaintiffs rely on a web printout of an apparent LinkedIn page purportedly created by the "Chief Executive Officer at UHS" in Atlanta. Pretermitting whether this document is hearsay, it is an informal social media reference to an unspecified UHS entity and does not rebut the overwhelming and uncontroverted evidence of the corporate structure.

> So long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other. Generally, our cases demand proof of control by the parent over the internal business operations and affairs of the subsidiary in order to fuse the two for jurisdictional purposes. The degree of control exercised by the parent must be greater than that normally associated with common ownership and directorship.[44]

There simply is no evidence of this type of dominion or control by parent UHS over its subsidiaries; the uncontroverted evidence is to the contrary.

Finally, with respect to engaging a lobbyist, the plaintiffs point to a website printout of a lobbyist registration in Georgia under the entity "UHS." The record does not disclose which UHS entity hired the lobbyist, and it is undisputed that multiple UHS subsidiaries operate in Georgia. Further, the above corporate structure and the Carson affidavit makes it clear that UHS is not involved in the operations of its subsidiary entities, and UHS Delaware (which remains in the suit) is the operational management subsidiary. Based on this record, the mention of "UHS" in a lobbyist

---

[44] (Punctuation omitted.) *Drumm Corp.*, 326 Ga. App. at 45. See *Hargrave v. Fibreboard Corp.*, 710 F2d 1154, 1160 (III) (5th Cir. 1983).

registration is insufficient to demonstrate contacts with Georgia for purposes of long-arm jurisdiction.[45]

*Judgment affirmed in Case No. A22A0204; reversed in Case No. A22A0205.*

*Reese, J., and Senior Appellate Judge Herbert E. Phipps concur.*

---

[45] See generally *Lamb v. Turbine Design, Inc.*, 273 Ga. 154, 155 (538 SE2d 437) (2000) ("[I]f a nonresident's contact with the jurisdiction consists solely of the nonresident's contact with a governmental entity that is located only within the jurisdiction, the contact is not counted in a personal jurisdiction analysis.").